**AFFIRM; and Opinion Issued April 18, 2013.**



**In The**

# Court of Appeals
# Fifth District of Texas at Dallas

**No. 05-11-01572-CR**

**VICTOR RAMOS, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 194th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F10-56076-M**

## MEMORANDUM OPINION

Before Justices Lang-Miers, Murphy, and Fillmore
Opinion by Justice Lang-Miers

A jury convicted appellant Victor Ramos of capital murder and the trial court assessed a mandatory sentence of life in prison. Appellant raises one issue on appeal arguing that the jury charge was erroneous. We resolve appellant's sole issue against him and affirm the trial court's judgment.

### BACKGROUND

Appellant was charged with murdering Sheldon McKnight during the course of a robbery. The indictment alleged that McKnight was stabbed with an unknown sharp object and struck with an unknown blunt object.

Most of the State's evidence was undisputed. McKnight's body was found lying in a burning bed in his ransacked apartment. He had sustained 72 stab wounds to the face and neck.

Among other physical evidence, blood with a DNA profile matching appellant's blood was found on a paper towel in McKnight's kitchen and McKnight's blood was found on appellant's temple and right ear.

Appellant testified about the events surrounding McKnight's murder and essentially claimed he was merely a bystander who did not participate in the murder and barely participated in the robbery. According to appellant, he and his friend Ricardo Beltran went to McKnight's two-story apartment "to chill with him." Appellant was high from drinking alcohol and using heroin. The three men sat on McKnight's two couches downstairs and watched a movie. Appellant fell asleep for about 30 or 40 minutes. When he woke up McKnight and Beltran were not in the room. Appellant heard McKnight's voice upstairs and went to see what was going on. When he got upstairs appellant saw McKnight and Beltran in a bedroom. Beltran was passed out and lying face down in the middle of a bed with his underwear pulled halfway down. McKnight was standing over Beltran wearing only pink panties and appeared to be raping Beltran. Appellant hit McKnight on the back of the head with his fist to get him off Beltran. McKnight fell onto the floor and appellant pushed Beltran with his leg to wake him up. Beltran was high and intoxicated and woke up confused. McKnight grabbed a knife from under the bed, stood up, and lunged at Beltran. The two men started fighting for control of the knife and McKnight told Beltran and appellant that they could not leave the apartment because McKnight had locked them inside. During the fight McKnight fell and his head broke a vase sitting on the dresser. Beltran took the knife and stabbed McKnight multiple times. Some of McKnight's blood splattered onto appellant. Appellant saw McKnight stop breathing and knew he was dead. Beltran decided to take some of McKnight's things, including a television and McKnight's Suburban, and appellant helped Beltran load the television in McKnight's Suburban. Appellant testified that his blood was found in McKnight's kitchen because he cut himself when moving McKnight's television.

2

Appellant also testified that he and Beltran did not cause the fire in McKnight's apartment and he does not know who or what caused it.

According to appellant, after he and Beltran left the apartment Beltran got rid of the knife. Beltran agreed to drive appellant to his friend's house in Oak Cliff. As he was driving Beltran dozed off and crashed McKnight's Suburban. Appellant got out and was walking in the street when a police car approached and two officers grabbed him. He spent the next several hours at the police station, during which time he was experiencing withdrawal symptoms—nausea, chills, and nasal congestion—from the heroine he had been using before McKnight's murder. Appellant admitted that he told the police "a bunch of lies" initially, but testified that he later told the police about all the events he described in his trial testimony.

Other witnesses testified about other evidence relating to McKnight's murder. Pertinent to this appeal, Dr. Chester Gwin, the medical examiner who performed McKnight's autopsy, testified that McKnight's death was caused by sharp-force and blunt-force injuries. Ken Balagot, a forensic biologist who tested DNA evidence in this case, testified that blood found on a piece of ceramic in McKnight's apartment matched McKnight's DNA profile.

Consistent with the indictment, the charge allowed the jury to find appellant guilty of capital murder if it found beyond a reasonable doubt that appellant, acting alone or with Beltran as a party to the offense, and during the course of committing or attempting to commit robbery, caused McKnight's death either by (1) stabbing or cutting McKnight with a sharp object, a deadly weapon, "the exact nature or description of which is unknown or unknowable to the Grand Jury," or (2) striking or hitting McKnight with a blunt object, a deadly weapon, "the exact nature or description of which is unknown or unknowable to the Grand Jury."

## ISSUE ON APPEAL

Appellant argues for the first time on appeal that the trial court erred when it charged the jury that the murder weapons used were unknown because the evidence adduced at trial "clearly identified the weapons"—namely, a knife and lamp.[1]  In response, the State argues that the jury charge was not erroneous because the murder weapons were indeed unknown.  We agree with the State.

To support his argument appellant relies exclusively on *Sanchez v. State*, 376 S.W.3d 767 (Tex. Crim. App. 2012).[2]  *Sanchez* is distinguishable.  In that case the complainant died of asphyxiation in a motel room.  Before she died police officers responded to a call from the motel and heard the fire of a stun gun and a woman screaming inside the room.  *Id.* at 769.  The police opened the only door to the room and found two people inside: the defendant and the deceased complainant.  During the defendant's trial the State's expert testified that the complainant died of asphyxiation.  Although the exact means of the asphyxiation was undetermined, the expert testified that it could have been caused by manual strangulation, smothering, the use of a stun gun, or some combination of these.  *Id.* at 770.  Consistent with the wording of the indictment, the trial court instructed the jury that it could convict the defendant if it found that:

(1) he intentionally or knowingly caused the death of the complainant by choking her with his hand;

(2) he intentionally or knowingly caused the death of the complainant by manner and means to the Grand Jurors unknown;

(3) he, with intent to cause serious bodily injury to an individual, committed an act clearly dangerous to human life by placing a stun gun on the person of the complainant that caused the death of the complainant; or

---

[1] In his brief appellant refers to a lamp as the blunt object identified by the evidence.  But he cites to Balagot's testimony about McKnight's blood being found on a piece of ceramic.  There is no evidence about a lamp in the record.

[2] In his opening brief appellant initially relied on a prior opinion in *Sanchez* that was withdrawn one month after appellant's brief was filed.  In a supplemental letter brief appellant explained that he is now relying on the superseding opinion in *Sanchez*, and that "the superseding opinion has no impact on [appellant's] previous argument."  We refer only to the superseding opinion.

4

(4) he, with intent to cause serious bodily injury to the complainant, committed an act clearly dangerous to human life by manner and means to the Grand Jurors unknown that caused the death of the complainant.

*Id.* On appeal the Texas Court of Criminal Appeals concluded that the jury instruction was erroneous. The court held that because "[t]he evidence in the record support[ed] only a limited list of known alternatives for the manner and means of the cause of death," the trial court should have eliminated the two theories describing the manner and means as unknown to the grand jury. *Id.* at 774.

In this case the trial court instructed the jury that the nature and description of the blunt and sharp objects used in the offense were unknown. Unlike in *Sanchez*, there was not a finite list of known alternatives identified by the State. The medical examiner testified generally that sharp-force injuries can be caused by "[a]nything with a pointed edge that is sharp," and blunt-force injuries can be caused by "[a]nything that is not sharp." Although appellant testified that Beltran used a knife to stab McKnight, and McKnight's blood was found on a piece of ceramic, the weapons used in McKnight's murder were never identified by the police, and the piece of ceramic was one of numerous items in McKnight's apartment that were found to have his blood on them.

The facts in this case are more analogous to the facts in *Velez v. State*, No. AP-76051, 2012 WL 2130890 (Tex. Crim. App. June 13, 2012) (not designated for publication). In *Velez* the defendant was convicted of capital murder of a child under six years old. The complainant's autopsy revealed that the cause of death was "significant head trauma." *Id.* at *2. The State's expert testified that the complainant's injuries were "fractures without scalp tears," which indicated that his head impacted with a hard, flat surface or object such as "'a floor or a wall. Something like that.'" *Id.* at *26. On appeal the defendant argued that the trial court erred when it instructed the jury that it could convict upon an unknown manner and means of causing death.

5

Instead, the defendant argued that the jury should have been instructed that it could convict only upon "'sufficient proof of one or several of the options presented by the evidence.'" *Id.* at \*24. The Texas Court of Criminal Appeals disagreed. It held that because the State presented testimony that investigators were unable to ascertain which surface or object the complainant's head was struck against, the means of the complainant's death was truly unknown and it was not error for the trial court to instruct the jury accordingly. *Id.* at \*26.

In this case, unlike in *Sanchez*, there was not a finite list of possible weapons identified by the State. Instead, as in *Velez*, the weapon or weapons used in the commission of the offense were truly unknown. As a result, we conclude that the jury charge was not erroneous. *See id.*

## CONCLUSION

We resolve appellant's sole issue against him and affirm the trial court's judgment.

/Elizabeth Lang-Miers/
ELIZABETH LANG-MIERS
JUSTICE

Do Not Publish
Tex. R. App. P. 47

111572F.U05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

VICTOR RAMOS, Appellant

No. 05-11-01572-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 194th Judicial District Court, Dallas County, Texas.
Trial Court Cause No. F10-56076-M.
Opinion delivered by Justice Lang-Miers, Justices Murphy and Fillmore participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 18th day of April, 2013.

/Elizabeth Lang-Miers/
ELIZABETH LANG-MIERS
JUSTICE